J-S12001-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2400 EDA 2021 |

Appeal from the Order Entered October 27, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000518-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.Z.A.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2401 EDA 2021 |

Appeal from the Decree Entered October 27, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000105-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2402 EDA 2021 |

Appeal from the Order Entered October 29, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000522-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.Z.Z.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |

```
                                    :
                                    :
APPEAL OF: J.C., FATHER             :
                                    :
                                    :
                                    :
                                    :
                                    :    No. 2403 EDA 2021
```

Appeal from the Decree Entered October 27, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000501-2021

```
IN THE INTEREST OF: Z.J., A MINOR   :    IN THE SUPERIOR COURT OF
                                    :        PENNSYLVANIA
                                    :
APPEAL OF: J.C., FATHER             :
                                    :
                                    :
                                    :
                                    :
                                    :
                                    :    No. 2404 EDA 2021
```

Appeal from the Order Entered October 27, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000521-2016

```
IN THE INTEREST OF: Z.A.-S.J., A    :    IN THE SUPERIOR COURT OF
MINOR                               :        PENNSYLVANIA
                                    :
                                    :
APPEAL OF: J.C., FATHER             :
                                    :
                                    :
                                    :
                                    :
                                    :    No. 2405 EDA 2021
```

Appeal from the Decree Entered October 27, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000502-2021

BEFORE:  BENDER, P.J.E., BOWES, J., and DUBOW, J.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED JUNE 6, 2022**

- 2 -

J.C. (Father) appeals from the decrees entered on October 27, 2021, which granted the petitions filed by the Philadelphia Department of Human Services (DHS), to involuntarily terminate his parental rights to his minor children, Z.Z.Z.J. (Child 1), born in April of 2011, Z.A.-S.J. (Child 2), born in November of 2008, and Z.Z.A.J. (Child 3), born in July of 2007, (collectively Children). Father also appeals from the orders that changed the goals for Children to adoption.[1] Additionally, Father's counsel has filed a petition to withdraw and a brief pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009). Upon review, we grant counsel's petition to withdraw and affirm the termination decrees and the goal change orders.

The **Anders** brief filed by Father's counsel contains a summary of the factual and procedural history of this matter as follows:

> The family became known to DHS on 12/24/15 after a General Protective Services Report (GPS) of medical neglect for one of the [C]hildren. The report was determined to be valid. Thereafter, DHS was unable to meet with the Mother[2] and the [C]hildren and could not access the family home. On 2/3/16, another GPS Report was received about another [C]hild experiencing academic difficulties in the first grade and missing school. This report was validated. On 3/3/16, DHS filed a Motion to Compel Cooperation which was granted, and an Order was entered requiring the Mother to permit DHS to enter the home and that the [C]hildren appear for the next court date. On

---

[1] In the captions above, each child is also identified by the initials Z.J. Due to this confusion, we identify each Child, as did the trial court, using the terms Child 1, Child 2 and Child 3.

[2] Mother is not a party to this appeal.

4/11/16, DHS filed an Urgent Dependency Petition for all three [C]hildren. The Petition for one [C]hild was discharged but two of the [C]hildren were adjudicated dependent. On 4/18/16, an Order of Protective Custody (OPC) was obtained for two of the [C]hildren and they were placed with the Maternal Cousin. On 8/1/16, the two [C]hildren were reunified with the Mother with DHS supervision in the home. The Dependency Petitions were discharged. On 2/1/18, the family was back in court for truancy after the School District of Philadelphia filed Petitions for two of the [C]hildren who had been missing excessive days of school. The [c]ourt ordered the [C]hildren to attend school and also ordered DHS to file Dependency Petitions. On 3/23/18, allegations were received that the Appellant (Father) had suffered a traumatic brain injury and that Mother was using the Supplemental Security Income (SSI) benefits to buy drugs. The [C]hildren were also still truant. On 3/26/18, pursuant to the court order Dependency Petitions were filed for the two truant [C]hildren. On 4/6/18, the two truant [C]hildren were adjudicated dependent. DHS supervision was implemented in the home. After a successful period of supervision, on 11/2/18, the [c]ourt terminated supervision of the two truant [C]hildren. On 3/6/19, a Child Protective Services (CPS) Report was received regarding the third [C]hild who was diagnosed with Obstructive Sleep Apnea. There were allegations that the Mother had failed to obtain medical treatment for the [C]hild. This report was indicated, and Mother was identified as the perpetrator of abuse. In response to the indicated report DHS filed another Urgent Petition. Subsequently, DHS learned that the other two [C]hildren were still truant from school. On 4/12/19, the [c]ourt adjudicated the third [C]hild dependent and awarded Temporary Legal Custody (TLC) to the Maternal Grandmother with DHS supervision in the home. After the adjudication of the third [C]hild, DHS learned that Mother was about to be evicted from her home and the two truant [C]hildren had been moved into the Maternal Cousin's home. When DHS visited the Maternal Cousin's home[,] it was learned that Mother had been leaving the [C]hildren home alone with no supervision. Another Urgent Petition was filed for the two truant [C]hildren on 6/26/19[,] and at the Adjudicatory Hearing on 7/19/19 the two [C]hildren were adjudicated dependent. Father failed to attend this adjudicatory hearing. On 8/8/19 at a permanency review hearing, the [C]hildren were ordered to remain as committed and placed. The [c]ourt ordered the referral of the Appellant Father to the Clinical Evaluation Unit (CEU) for a forthwith drug screen and three random screens prior to the next

court date. Once again Father did not attend the hearing. Visitation was ordered for the Father should he avail himself to DHS. On 10/3/19, a Single Case Plan (SCP) meeting was held. The objectives set forth for the Father were to maintain contact with the Community Umbrella Agency (CUA), attend CEU for drug screens and an assessment, attend parenting classes, [and] participate in supervised visitation. Father did not attend the meeting. On 12/13/19, at the permanency review hearing, it was announced that Mother had not been compliant and that she planned to sign voluntary relinquishments of her parental rights. Father failed to attend this hearing as well and the [c]ourt continued to order the implementation of his objectives. At the next hearing on 3/6/20, the [c]ourt found that the Father was still non-compliant with his objectives. At the next permanency review hearing, Father once again failed to appear, although the [c]ourt did find that the Father was minimally compliant. At this hearing[,] the [c]ourt ordered a dual diagnosis assessment for the Father and also ordered an Achieving Reunification Center (ARC) referral so that Father could receive necessary services. There was a revised SCP on 10/14/20[,] and once again Father failed to participate in the SCP meeting. At that point, one of the [C]hildren's goals [was] changed to adoption while the other two [C]hildren's goals were changed to Permanent Legal Custody (PLC). On 1/8/21, a permanency review hearing was held virtually due to the Covid pandemic and once again Father failed to appea[r]. He was once again found to be minimally compliant with his objectives and once again the objectives were court ordered. On 2/24/21, DHS filed a Petition To Terminate Father's Parental Rights as to one child only. Another permanency review hearing was held virtually on 4/28/21 and Father failed to appear. On 7/21/21, another permanency review hearing was held and this time the Father appeared. The [c]ourt found that there was no compliance by the Father with his objectives and that there was no progress by the Father in alleviating the circumstances that necessitated the placement of his [C]hildren. Father's SCP objectives were once again court ordered. On 9/3/21, there having been no compliance by the Father, DHS filed Petitions to Terminate Father's Parental Rights as to the two remaining [C]hildren. The Goal Change/Termination trial was held on 10/27/21 and Father failed to attend. After hearing evidence in the case, the [c]ourt found that there was clear and convincing evidence to involuntarily terminate the Father's parental rights as to all three [C]hildren under 2511(a)(1), (2) and 2511(b) and to change their permanency goals to adoption pursuant to 42 Pa.C.S.

[§] 6351. Predecessor Counsel filed timely appeals and [Pa.R.A.P.] 1925(b) Statements challenging the change of the permanency goals to adoption. Predecessor Counsel was then granted leave to withdraw and on 12/14/21 this counsel was appointed to represent Appellant Father on appeal.

At the Goal Change/Termination trial Salenai Brasswell, Case Manager for CUA 7 Turning Points for Children, testified that one [C]hild had become involved due to a CPS Report on 3/19/19 as a result of inadequate attention to the [C]hild's needs: healthcare and hygiene; and because of a lack of parenting skills. The [C]hild had an issue with her tonsils. The [C]hild was adjudicated on 4/12/19 and TLC was granted to the Maternal Grandmother. The other two [C]hildren had become known to DHS in 2016 and in 2019 they came into care amidst allegations of domestic violence in the home and inadequate attention to their basic needs: education and healthcare. On 7/19/19, these two [C]hildren were adjudicated dependent. All of the [C]hildren had remained in care since [their] adjudications. A Single Case Plan was developed for the family. Father's objectives were to keep in contact with the CUA Case Manager weekly, to attend CEU for random screens, to attend ARC for parenting and housing and to participate in supervised visitation. CUA communicated the objectives to the Father in person. Father never completed any of his objectives, although for a brief period he was at an in[-]patient program. Ms. Braswell rated Father's compliance with his Single Case Plan objectives as minimal and his progress towards alleviating the circumstances that brought his [C]hildren into care as none. Ms. Braswell also opined that while there was a bond between the Father and his [C]hildren due to his sporadic visits with them, the bond was not a parental bond. None of the [C]hildren looked to the Father for their daily physical, medical or emotional needs, rather they looked to the resource parent to fulfill their needs. Ms. Braswell further opined that it would not cause the [C]hildren irreparable harm to terminate the Father's parental rights and that it would be in all of the [C]hildren's best interests to free the [C]hildren for adoption[.]

On cross-examination, Father's counsel brought out that Father had been visiting sporadically and that he would still be able to see the [C]hildren after termination of his parental rights and adoption[.]

During the trial Judge Fernandes specifically inquired of the Child Advocate TPR [(Termination of Parental Rights)] Counsel about whether she had met with the [C]hildren, who were 13, 12 and 10, and what needed to be reported. The Child Advocate indicated that she had met with the [C]hildren twice, that the [C]hildren stated that they all wanted to remain where they were, and that if they couldn't go home to the parents, they were happy to be adopted. The [C]hildren also reported that they did want to continue to visit with their parents and that they did want to continue with phone contact[.]

The testimony of the CUA Case Manager Braswell constituted the proof from which Judge Fernandes reached his conclusions. No other witnesses were presented by DHS or the parents. Father did not appear at the hearing and Father's counsel presented no evidence. At the conclusion of the case, Judge Fernandes ruled that there was clear and convincing evidence to terminate the Father's parental rights under Sections 2511(a)(1) and (2) and 2511(b) and that it was in the best interests of all three [C]hildren to change the goals to adoption. The [c]ourt cited that while there was a bond with the Father it was not a parental bond and that there would be no irreparable harm to the [C]hildren by terminating the Father's parental rights[.]

*Anders* brief at 9-14 (citations to the record omitted).

Initially, as noted above, Father's counsel filed an *Anders* brief and a petition to withdraw. Before reaching the merits of Father's appeal, we must first address counsel's request to withdraw. *See Commonwealth v. Rojas*, 874 A.2d 638, 639 (Pa. Super. 2005) ("'When faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw.'") (quoting *Commonwealth v. Smith*, 700 A.2d 1301, 1303 (Pa. Super. 1997)). "In *In re V.E.*, … 611 A.2d 1267 ([Pa. Super.] 1992), this Court extended the *Anders* principles to

appeals involving the termination of parental rights." *In re X.J.*, 105 A.3d 1, 3 (Pa. Super. 2014). To withdraw pursuant to *Anders*, counsel must:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citing *Commonwealth v. Lilley*, 978 A.2d 995, 997 (Pa. Super. 2009)). With respect to the third requirement of *Anders*, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005).

Additionally, an *Anders* brief must comply with the following requirements:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 978 A.2d at 361.

In the instant matter, counsel has filed a petition to withdraw, certifying that he has reviewed the case and determined that Father's appeal is wholly frivolous. Counsel also has filed a brief that includes a summary of the history and facts of the case, issues raised by Father, and counsel's assessment of why those issues are frivolous, with citations to relevant legal authority. Attached to his petition to withdraw, counsel has included a copy of his letter to Father, advising him that he may obtain new counsel or raise additional issues *pro se*. Accordingly, counsel has substantially complied with the requirements of **Anders** and **Santiago**. **See Commonwealth v. Reid**, 117 A.3d 777, 781 (Pa. Super. 2015) (observing that substantial compliance with the **Anders** requirements is sufficient). We, therefore, may proceed to review the issues outlined in the **Anders** brief. In addition, we must "conduct an independent review of the record to discern if there are any additional, non-frivolous issues overlooked by counsel." **Commonwealth v. Flowers**, 113 A.3d 1246, 1250 (Pa. Super. 2015) (footnote omitted).

Counsel's **Anders** brief lists the following in the section entitled Statement of Questions Involved:

> 1. Is there anything in the record that might arguably support the appeal that obviates a conclusion that the appeal is frivolous and that would support the Father's contention that it would not be in the best interests of his [C]hildren to change the permanency goals to adoption or to terminate his parental rights under the Adoption Act?
>
> 2. Whether the trial court abused its discretion when it changed the permanency goals to adoption in the absence of clear and convincing evidence that reunification is not

> viable and that adoption would best serve the [C]hildren's needs and welfare?

> 3. Whether the trial court abused its discretion by involuntarily terminating the Father's parental rights under Sections 2511(a)(1), (2) and 2511(b)?

> 4. Whether the trial court abused its discretion by failing to sufficiently inquire about the [C]hildren's desire to maintain an ongoing legal relationship with the Father and to ensure that the [C]hildren understood the termination of Father's parental rights and wanted to be adopted?

**Anders** brief at 7-8.

We begin with Father's claim that the goal for Children should not have been changed to adoption in that this change "was not in the best interest for [Children's] intellectual, moral and spiritual well[-]being." **Id.** at 22. Father also contends that he was making progress toward alleviating some of the conditions necessitating Children's placement and that he has a bond with Children.

In addressing this issue, we are guided by the following:

In cases involving a court's order changing the placement goal … to adoption, our standard of review is abuse of discretion. **In re N.C.**, 909 A.2d 818, 822 (Pa. Super. 2006). To hold that the trial court abused its discretion, we must determine its judgment was "manifestly unreasonable," that the court disregarded the law, or that its action was "a result of partiality, prejudice, bias or ill will." **Id.** (quoting **In re G.P.-R.,** 851 A.2d 967, 973 (Pa. Super. 2004)). While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a "responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record." **In re A.K.**, 906 A.2d 596, 599 (Pa. Super. 2006). Therefore, our scope of review is broad. **Id.**

*In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008).

Furthermore, this Court has stated:

Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act[, 42 Pa.C.S. §§ 6301-65], which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents.

*In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006) (citations and footnotes omitted; emphasis in original).

Pursuant to section 6351(f) of the Juvenile Act, when considering a petition for goal change for a dependent child, the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; and (5) a likely date by which the goal for the child might be achieved. *In re S.B.*, 943 A.2d at 977. The best interests of the child, and not the interests of the parent, must guide the trial court. *Id.* at 978. As this Court has held, "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the

responsibilities of parenting." *In re N.C.*, 909 A.2d at 824 (quoting *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003)).

The trial court's opinion provides the following factual determinations and reasoning in response to Father's argument concerning the goal change for Children to adoption:

> Father's SCP objectives throughout the life of the case included: complying with court orders, contacting CUA on a weekly basis, attend[ing] CEU for random drug screens, attend[ing] ARC for parenting and housing programs, and participat[ing] in visitation. Father was aware of his objectives, having been informed of them by the CUA Case Manager in person. Father did not maintain consistent contact with the CUA Case Manager throughout the life of the case. The CUA Case Manager referred Father for a dual diagnosis assessment; Father did not complete the assessment. The CUA Case Manager consistently sent Father to complete random drug screens at the CEU; Father did not complete any random screens. Father claimed to be involved in a drug and alcohol treatment program at the hearing prior the TPR trial, but the CUA Case Manager never received any documentation of a treatment plan or confirmation of his enrollment. The CUA Case Manager referred Father to ARC for housing and parenting programs; Father did not complete either program. The CUA Case Manager did not have information as to whether Father currently has safe and stable housing. Father's visits never graduated past supervised at the agency. Father also did not consistently attend visits throughout the life of the case. Father attended a visit on October 6 but had not been complying with confirming Wednesday visits on Mondays as required. The CUA Case Manager reported that Children become upset when they do not have visits with their parents and that this disrupts their daily lives. Father's visits were consistent in August 2021, but in September 2021 Father became inconsistent again. The CUA Case Manager testified that Child 2 and [Child] 3 share a bond with Father, but it is not a parental bond. The CUA Case Manager testified that it was in all three Children's best interest to be released for adoption. Reasonable efforts were made to assist Father with his SCP objectives. However, after thirty-one months, there had been no progress in alleviating the circumstances necessitating Children's removal from Father's care. The record established by clear and

convincing evidence that the court's change of permanency goal from reunification to adoption was proper.

Trial Court Opinion (TCO), 1/14/2022, at 21-22 (citations to the record omitted). Our review of the record reveals that it supports the trial court's conclusion that changing the goals for Children to adoption would best serve their needs and welfare. Thus, Father is not entitled to any relief as to the change of goal to adoption.

We next address Father's issue concerning the termination of his parental rights. We review such an order in accordance with the following standard:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The trial court is free to believe all, part, or none of the evidence presented

- 13 -

and is likewise free to make all credibility determinations and resolve conflicts in the evidence. ***In re M.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. ***In re Adoption of T.B.B.***, 835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following: Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***R.N.J.***, 985 A.2d at 276.

With regard to Section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

- 14 -

Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

**In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010).

As noted above in its opinion, the trial court terminated Father's parental rights pursuant to section 2511(a)(1), (2) and (b). We need only agree with the trial court as to any one subsection of section 2511(a), as well as section 2511(b), in order to affirm. **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate under sections 2511(a)(2) and (b), which provide as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

- 15 -

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Father contends that he is "trying his best to cure the conditions that led to the placement of his [C]hildren and that he would someday become a good parent." *Anders* brief at 24. He further argues that he is working toward completing his objectives and that he has a bond with Children. Father

also complains that no services were provided relating to his brain injury. In response to Father's arguments relating to section 2511(a)(2), the trial court explained its findings and conclusions in a discussion similar to its goal change reasoning, stating:

Children have been involved with DHS on multiple occasions, but the most recent set of dependency issues began in 2019. Child 3 has been continuously in DHS since April 2019. Child 1 and 2 have been continuously in DHS care since July 2019. Children were adjudicated dependent and committed to the care of DHS due to inadequate attention to Children's basic, medical, and hygiene needs, as well as educational and domestic violence concerns. Father's SCP objectives throughout the life of the case included: complying with court orders, contacting CUA on a weekly basis, attend[ing] CEU for random drug screens, attend[ing] ARC for parenting and housing programs, and participat[ing] in visitation. Father was aware of his objectives, having been informed of them by the CUA Case Manager in person. Father did not maintain consistent contact with the CUA Case Manager throughout the life of the case. The CUA Case Manager referred Father for a dual diagnosis assessment; Father did not complete the assessment. The CUA Case Manager consistently sent Father to complete random drug screens at the CEU; Father did not complete any random screens. Father claimed to be involved in a drug and alcohol treatment program at the hearing prior [to] the TPR trial, but the CUA Case Manager never received any documentation of a treatment plan or confirmation of his enrollment. The CUA Case Manager referred Father to ARC for housing and parenting programs, [but] Father did not complete either program. The CUA Case Manager did not have information as to whether Father currently has safe and stable housing. Father's visits never graduated past supervised at the agency. Father also did not consistently attend visits throughout the life of the case. Father attended a visit on October 6 but had not been complying with confirming Wednesday visits on Mondays as required. The CUA Case Manager reported that Children become upset when they do not have visits with their parents and that this disrupts their daily lives. Father's visits were consistent in August 2021, but in September 2021 Father became inconsistent again. The CUA Case Manager testified that Child 2 and 3 share a bond with Father, but it is not a parental bond.

- 17 -

Children do not turn to Father for their daily medical or emotional needs. Children also do not turn to Father for safety and stability, care or comfort.

The CUA Case Manager reported Father was minimally compliant with his SCP objectives and no progress had been made to alleviating the circumstances necessitating Children's dependency placement. Father attended only one court hearing throughout the life of the case[,] … did not attend the TPR hearing to provide evidence or testimony and was aware of his SCP objectives. Father has had ample opportunity to put himself in a position to adequately parent and care for Children, but his repeated and continued incapacity has not been mitigated. Father has displayed an inability or unwillingness to remedy the causes of his incapacity. Father is unable to [meet] Children's basic needs. The testimony of the CUA Case Manager was credible. Father has demonstrated an unwillingness to acknowledge or remedy the causes of his incapacity to parent in order to provide Children with the essential parental care, control, or subsistence necessary for their physical and mental well-being. Termination under 23 Pa.C.S.[] § 2511(a)(2) was proper.

TCO at 14-15 (citation to the record omitted). With regard to section 2511(b),

the trial court explained:

Children also do not turn to Father for safety and stability, care or comfort. Child 3 is involved in autism services and is doing well in her kinship home. The CUA Case Manager testified it would not do any irreparable harm to terminate Father's parental rights to Child 3. Child 3 looks to her kinship parent to meet all of her needs and views [her] as her parent, not Father. The CUA Case Manager testified similarly as to Child 2 and [Child] 1, in that it would also not cause irreparable harm to them to terminate Father's parental rights. The trial court found that there was a bond between Father and Children, but it was not a parental bond. The trial court noted that due to the Children being slightly older, the court took no issue with Children continuing to have supervised contact with Father, but that termination of parental rights was still in Children's best interest. The record establishes by clear and convincing evidence that termination would not sever an existing and beneficial relationship between Father and Children. The trial court's termination of Father's parental rights

- 18 -

to Children under 23 Pa.C.S.[] § 2511(b) was proper.

*Id.* at 20 (citations to the record omitted). Again, after a thorough review of the record in this matter, we conclude that the trial court did not abuse it discretion by terminating Father's parental rights pursuant to section 2511(a)(2) and (b). The testimony provided at the termination/goal change hearing supports the court's findings and conclusions as to Children's needs and welfare. Children will not suffer irreparable harm if Father's parental rights are terminated.

Accordingly, our independent review of Father's claims demonstrates that they do not entitle him to relief. Moreover, our review of the record does not reveal any non-frivolous issues overlooked by counsel. *See Flowers*, 113 A.3d at 1250. Therefore, we grant counsel's petition to withdraw. We also affirm the trial court's decrees terminating Father's parental rights and the orders changing Children's goals to adoption.

Decrees affirmed. Orders affirmed. Petition to withdraw granted.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/6/2022

- 19 -